**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Excel Fortress Limited, et al., | No. CV-17-04297-PHX-DWL |
| Plaintiffs, | **ORDER** |
| v. | |
| Vaughn La Verl Wilhelm, et al., | |
| Defendants. | |

The operative complaint in this case, filed by Plaintiffs EFG America LLC ("EFG") and Excel Fortress Limited ("Excel Fortress") (collectively, "Plaintiffs"), asserted seven claims against five defendants. (Doc. 62.) However, in January 2019, Plaintiffs agreed to dismiss all defendants except Vaughn Wilhelm ("Wilhelm") and to dismiss two of their claims against Wilhelm. (Doc. 130.) Later, Plaintiffs agreed to dismiss four more of their claims against Wilhelm. (Doc. 159 at 13; Docs. 165, 173.) As a result, there is only claim remaining in the case: EFG's claim against Wilhelm for negligence.

Now pending before the Court is Wilhelm's motion for summary judgment on the negligence claim (Doc. 157) and motion for sanctions pursuant to Rule 11 (Doc. 171). For the following reasons, the Court will grant the motion for summary judgment, deny the motion for sanctions, and terminate this action.

…

…

…

**BACKGROUND**

I.  Factual Background

Excel Fortress is a Hong Kong company that specializes in "the business of researching and developing proprietary devulcanization technology for rubber recovery and recycling to produce new rubber products."[1] (Doc. 62 ¶¶ 2, 11.) To further that business, Excel Fortress engaged Dr. Li Xing Ru, a resident of China, to develop "new technology for reclaiming rubber from tires and butryonitrile." (Id. ¶¶ 12-13.) Excel Fortress and Dr. Li entered into a series of employment agreements under which Dr. Li would develop "the formulae and technologies for manufacturing and applying various special reclaiming agents . . . and the technology for re-vulcanizing scrap tires and butryonitrile." (Id. ¶¶ 13-18.) Dr. Li successfully completed that work. (Id ¶ 16.) Excel Fortress paid Dr. Li for "its use and patent rights in the two new technologies." (Id.) According to Excel Fortress, these "new technologies are unique and could potentially revolutionize the recycled rubber market." (Id. ¶ 20.)

Excel Fortress began to license the technologies. (Id. ¶ 21.) It entered into a global license agreement with Gate Corporation, which in turn sub-licensed the technologies to EFG for EFG's use in North America. (Id.) In September 2014, to facilitate its use of the licenses, EFG hired, among others, Wilhelm.[2] (Id. ¶ 23.) EFG alleges that Wilhelm thereafter "became acquainted with Dr. Li" and "became very familiar with the two new technologies." (Id. ¶¶ 25, 27.) This included "gaining direct access to various product information, technology design and specifications, proprietary formulae, and technical scientific relationships belonging to Excel Fortress." (Id. ¶ 27.) In an effort to protect its assets, Excel Fortress required EFG to have those with access to the technologies sign non-disclosure agreements. (Id. ¶ 28.) EFG alleges that Wilhelm was required to and did sign such an agreement. (Id. ¶¶ 29-30.)

---

[1]  Devulcanization converts hardened rubber products, such as tires, into a more "raw" form for use in other applications.

[2]  The precise nature of Wilhelm's relationship with EFG is in dispute. (Doc. 182 at 4 ¶¶ 3-6.)

EFG alleges that its relationship with Wilhelm quickly deteriorated. Beginning in 2016, Wilhelm began communicating with Dr. Li. (*Id.* ¶ 32.) According to EFG, Wilhelm was feeding Dr. Li lies about how Plaintiffs were utilizing the technologies and cheating Dr. Li out of profits realized from the technologies. (*Id.*) Capitalizing on Dr. Li's anger, Wilhelm introduced Dr. Li to another potential employer, Eversource Capital LP ("Eversource"). To facilitate Dr. Li's employment with Eversource, Wilhelm, Ryan McHugh, and Dr. Li's daughter allegedly "obtained a false legal opinion that Dr. Li's Employment Agreement [with Excel Fortress] was invalid and that he was not restricted from agreeing to work for [Eversource]." (*Id.* ¶ 37.) They used that false opinion to convince Dr. Li that he could work for Eversource. (*Id.*) Dr. Li accepted employment with Eversource and allegedly began divulging sensitive information about the new devulcanization technologies so Eversource could directly compete with EFG. (*Id* ¶ 38.)

EFG alleges that Wilhelm took several other actions that caused it to sustain damages. (*Id.* ¶¶ 39-47.) Among these actions is what EFG has dubbed "corporate sabotage." (*Id.* at 12.) The complaint alleges that, as part of his engagement with EFG, Wilhelm "was given responsibility for the acquisition and preparation of certain critical specialty chemical compounds required in the creation of . . . EFG's products, including receiving information about the molecular structure and suppliers of each chemical." (*Id.* ¶ 48.) Then, "[d]espite receiving specific documented information regarding the ingredients and formulation of the chemical compounds," Wilhelm botched the ordering of those compounds, even failing to obtain the "key ingredient, called butyl stearate." (*Id.* ¶ 49.) Instead, he bought "an entirely different and completely unrelated chemical, zinc naphthenate." (*Id.*) There were other component chemicals completely missing, and some other chemicals that EFG had no use for. (*Id.* ¶ 50.)

These allegations provide the foundation for Count Six of the operative complaint, which is EFG's claim against Wilhelm for negligence. (*Id.* ¶¶ 87-91.) The complaint alleges that "[t]he standard of care is that which any reasonable consultant in the same or similar circumstances would exercise to protect EFG from an unreasonable risk of harm."

(*Id.* ¶ 89.) In its mandatory disclosures, provided during the discovery process in this case, EFG provided additional clarification and details concerning the nature of its negligence claim. (Doc. 157-3 at 6-7 [EFG's July 1, 2019 supplemental disclosure]. *See also* Analysis, Part I.C *infra*.)

II. Procedural Background

On April 13, 2017, Plaintiffs initiated this action in the District Court for the Southern District of Texas. (Doc. 1.)

On June 5, 2017, Plaintiffs filed an amended complaint. (Doc. 6.)

On July 10, 2017, Wilhelm and his then co-defendants (collectively, "Defendants") moved to dismiss for lack of personal jurisdiction, or, in the alternative, to transfer the case to this District or the District of Idaho. (Doc. 18.) Plaintiffs opposed the motion. (Doc. 34.) The presiding judge granted the motion to transfer and ordered the case transferred to Arizona.[3] (Doc. 39.)

On April 30, 2018, Plaintiffs filed their second amended complaint. (Doc. 62.)

A. **The November 20, 2018 Order**

On October 15, 2018, Plaintiffs moved to transfer and consolidate two related cases "for discovery purposes only." (Doc. 79 at 1.) The other case, in a role-reversal from this case, involved EFG being sued for its alleged failure to repay loans. (*Id.* at 1-3.) Plaintiffs argued the cases were related and involved substantially the same parties. (*Id.*) Defendants disagreed, characterizing the motion as "nothing but an attempt to secure an extension of discovery after Plaintiffs have failed to pursue discovery for over seven months." (Doc. 81 at 2.)

Around the same time, the parties notified the Court of a discovery dispute. (Doc. 83.) Plaintiffs believed they were entitled to information about Defendants' "past and current devulcanization business efforts and development of devulcanized rubber, related communications, (including communications relating to Dr. Li and his daughter . . .),

---

[3] The case was received in this District on November 22, 2017 and assigned to Judge Tuchi. (Doc. 41.) It was reassigned to the undersigned judge on October 31, 2018. (Doc. 82.)

- 4 -

related business expenses (bank records), and business contact, travel, and communication efforts (phone records)." (*Id.* at 1.) On November 5, 2018, Plaintiffs moved to extend the deadline for them to produce an expert report on rubber devulcanization. (Doc. 88.) Under the scheduling order, their expert disclosures had been due three days earlier. (Doc. 55 at 2.) Plaintiffs argued they had timely identified their expert witnesses, but because "Defendants refused and have failed to meaningfully respond to Plaintiffs' discovery requests regarding Defendants' rubber devulcanization efforts," those experts had been unable to complete their analysis and generate a report. (*Id.* at 2.) Defendants opposed the request, arguing there was no good cause to extend the disclosure deadline—the supposedly "deficient" discovery had been produced eight months earlier, Defendants argued, so there was no reason to reward Plaintiffs for failing to act since then. (Doc. 91.)

On November 20, 2018, the Court issued an order that denied in significant part Plaintiffs' discovery requests, denied the motion to extend the expert-disclosure deadline, and denied the motion to transfer. (Doc. 100 at 1.) First, as for Plaintiffs' discovery requests, the Court concluded that most were overbroad but ordered Defendants to produce information about their meetings with Dr. Li and his daughter. (*Id.* at 4-9.) Second, as for the extension request, the Court concluded that Plaintiffs' actions were "the antithesis of diligence." (*Id.* at 10.) "Plaintiffs were not diligent in pursuing discovery," waiting more than eight months to raise their grievances with Defendants' initial responses. (*Id.*) Third, as for the transfer request, the Court saw "very little factual overlap." (*Id.* at 11.) More important, "there [was] little reason to believe consolidation [would] promote judicial economy." (*Id.*) Consolidating the cases would work to the hardship of Defendants because it would "increase their litigation costs and significantly delay their case's resolution." (*Id.* at 12.) "Moreover, the effect of ordering consolidation would be to give Plaintiffs a second bite at the discovery apple after displaying a marked lack of diligence over the past eight months." (*Id.*)

B. **The January 9, 2019 Order**

On November 16, 2018, Defendants moved to strike Plaintiffs' expert disclosures

because (1) Dr. Jinzhu Yang, a Chinese lawyer, provided legal opinions that "are within the province of the Court, not an expert," (2) Plaintiffs failed to provide a report for Dr. Jacques Noordermeer, their rubber devulcanization expert, and (3) there was no summary of facts or opinions to which Michael Kumbalek, EFG's President, would testify. (Doc. 92.) Plaintiffs opposed the motion, arguing that Dr. Yang's report was proper under Rule 44.1 and that Defendants "failed to fulfill the factors required for striking expert disclosures" in regard to Dr. Noordermeer and Kumbalek. (*Id.* at 2.) On this latter point, Plaintiffs again argued that Defendants' failure to provide requested discovery had hampered the development of their case, including securing expert reports. (*Id.* at 5.)

While that motion was pending, the parties submitted two further notices of discovery disputes. First, Plaintiffs asserted they were "entitled to review the rubber devulcanization technology Defendants are using to determine whether or not it compares to Plaintiffs' trade secrets." (Doc. 113.) Second, Plaintiffs wanted to depose Dr. Li "as a managing agent of Defendant Group to testify about the misappropriation of Plaintiffs' trade secrets." (Doc. 114 at 1.) Plaintiffs believed judicial intervention was required because "Chinese law prevents his voluntary deposition in China for a U.S. legal action." (*Id.*) Defendants argued that Plaintiffs misinterpreted Chinese law and that Dr. Li could be deposed in China, and, more important, Dr. Li was unavailable as a witness due to age and health issues. (*Id.* at 2.) Defendants proposed that each side submit questions that Dr. Li could answer in a sworn affidavit. (*Id.*)

On January 9, 2019, the Court entered an order resolving the outstanding motions and disputes. (Doc. 122.) The Court denied the motion to strike the expert disclosures, denied Plaintiffs' request to compel Defendants to provide additional discovery material, and denied Plaintiffs' request to depose Dr. Li. (*Id.*) As for Defendants' motion to strike, the Court first found that Dr. Yang's conclusions were appropriate under Rule 44.1. (*Id.* at 5.) As for Dr. Noordermeer, the Court concluded that "Plaintiffs have not come close to meeting their burden of showing they were 'substantially justified' in failing to comply" with the disclosure deadline and produce his report. (*Id.* at 7.) Thus, the only issue was

whether Plaintiffs had demonstrated that late disclosure would be harmless. (*Id.*) Because Plaintiffs had still not produced a report, the Court had an insufficient record to determine whether their late disclosure would be harmless, so the Court ultimately settled on denying Defendants' motion to strike without prejudice. (*Id.* at 7-8.) Similarly, as for Kumbalek, the Court focused on "what consequence should flow from Plaintiffs' failure" to provide a summary of the opinions and conclusions to which he would testify. (*Id.* at 9.) Because Plaintiffs' failures regarding Kumbalek were "nearly identical" to those regarding Dr. Noordermeer, the Court took the same approach and denied the motion to strike without prejudice. (*Id.* at 9-10.)

The Court also elaborated upon its reasons for denying Plaintiffs' request for further discovery, which it had previously denied during a telephonic hearing. (*Id.* at 10-11. *See also* Doc. 116.) Ultimately, Plaintiffs were asking the Court to order Defendants to answer a question "different from, and broader than, the question actually posed in the written discovery requests." (Doc. 122 at 11.) As for Plaintiffs' request to depose Dr. Li, the Court concluded that Dr. Li was not a managing agent of the corporate defendants. (*Id.* at 12.) Thus, Plaintiffs were required to comply with the Hague Convention procedures that govern depositions of foreign citizens outside of the U.S. (*Id.* at 11-12.) Accordingly, the Court denied Plaintiffs' request to compel defendants to make Dr. Li available. (*Id.* at 13.)

### C. **Voluntary Dismissal Against All Defendants Except Wilhelm**

On January 10, 2019, Plaintiffs filed a motion to dismiss, without prejudice, all claims against Wilhelm's co-defendants and Counts One and Two of the second amended complaint as they pertained to Wilhelm. (Doc. 123 at 1-2.) Defendants didn't oppose this request and only asked that, if Plaintiffs sought to re-file the dismissed claims, they be required to do so in this Court. (Doc. 127 at 1.) Plaintiffs accepted that condition (Doc. 129), so the Court granted the motion (Doc. 130).

### D. **Wilhelm's Motion For Discovery Sanctions**

On March 8, 2019, Wilhelm, now the only remaining defendant, moved for discovery sanctions pursuant to Rule 37. (Doc. 134.) Specifically, Wilhelm objected to

Plaintiffs' late-disclosed damages calculation of over $52 million and sought to "preclude Plaintiffs from introducing any evidence in support of" those calculations. (*Id.* at 2.) Wilhelm also alleged that Plaintiffs had made repeated misrepresentations to him and the Court about the extent to which Plaintiffs sought to recoup lost profits or payments to Dr. Li. (*Id.* at 2-3.) Plaintiffs opposed the motion. (Doc. 136.)

On June 17, 2019, the Court issued an order granting the motion in part and denying it in part. (Doc. 151.) The Court agreed that Plaintiffs' disclosures were inadequate, but this "should have prompted Wilhelm to seek clarification." (*Id.* at 6-7.) Instead, Wilhelm waited 13 months to do anything, and rewarding that strategy "would create perverse incentives." (*Id.* at 7.) Accordingly, the Court declined to impose sanctions for Plaintiffs' late disclosure. (*Id.* at 3-7.) Nor did the Court impose sanctions for the misrepresentations related to Plaintiffs' lost profits—the Court didn't view Plaintiffs' communications on the matter "as some sort of intentional attempt to mislead" and whatever problems the miscommunications had created could be fixed through additional discovery. (*Id.* at 9.) On the other hand, the Court found "[t]he facts concerning the Dr. Li payments . . . troubling." (*Id.* at 11.) On this issue, "Plaintiffs' counsel made repeated misstatements that were, at best, the product of sloppiness and negligence." (*Id.*) Additionally, Plaintiffs had originally produced incomplete financial records and only produced a complete set after Wilhelm repeatedly objected. (*Id.*) That said, it wasn't "entirely clear whether (or to what extent) Wilhelm was prejudiced by this episode." (*Id.*) Thus, the Court declined to impose Wilhelm's requested sanction. (*Id.* at 11-12.)

Instead, the Court ordered the parties to meet and confer about additional steps needed to cure any prejudice Wilhelm suffered due to Plaintiffs' misstatements. (*Id.* at 9, 12.) The Court warned that Wilhelm might be entitled to costs and expenses if further discovery proved necessary and noted that Plaintiffs could avoid such expenses by agreeing to dismiss the problematic claims. (*Id.*)

During the ensuing meet-and-confer process, Plaintiffs agreed to dismiss Counts Three, Four, Five, and Seven against Wilhelm. (Doc. 159 at 13. *See also* Doc. 165 [formal

motion to dismiss]; Doc. 173 [dismissal order].) This meant the only remaining claim was Count Six, EFG's claim against Wilhelm for negligence. On July 2, 2019, Wilhelm filed a motion for summary judgment on that claim. (Doc. 157.)

Wilhelm was not mollified by Plaintiffs' agreement to dismiss Counts Three, Four, Five, and Seven. (Doc. 157.) In the parties' joint memorandum filed in response to the Court's June 17, 2019 order, Wilhelm requested fees related to the discovery dispute (including the drafting of the joint submission), the fees incurred because of "Plaintiffs' misleading statements," fees related to preparing a motion for summary judgment on claims Plaintiffs had subsequently withdrawn, and fees related to pursuing discovery on claims Plaintiffs had subsequently withdrawn. (Doc. 159 at 3.) Plaintiffs opposed this request. (*Id.* at 13-15.)

On July 25, 2019, upon reviewing the joint submission, the Court authorized Wilhelm to file a motion for attorneys' fees related to the discovery dispute but declined to award fees on any other basis. (Doc. 164 at 3-4.)

On August 8, 2019, Wilhelm filed his motion for fees. (Doc. 167). Plaintiffs objected to the fee request, arguing that it was arbitrary, unreasonable, and beyond the scope of what the Court had authorized. (Doc. 174.) The Court concluded "most of Plaintiffs' objections are baseless" but agreed that Wilhelm had involved more lawyers than necessary, so the Court struck the fees requested for the work of one attorney. (Doc. 188 at 7-11.) Accordingly, the Court awarded Wilhelm $23,275 in fees and $1,417.76 in costs. (*Id* at 11.)

E.  **EFG's Motion To Defer Consideration**

As noted, Wilhelm filed a summary judgment motion on July 2, 2019. (Doc. 157.) On July 12, 2019, EFG moved under Rule 56(d) to defer consideration of Wilhelm's motion until it had the chance to depose Wilhelm. (Doc. 160.) EFG characterized the summary judgment motion as "sudden and premature" and argued it "must be permitted to seek the discovery it needs from Defendant's deposition to provide a fair and complete opposition" to the summary judgment motion. (*Id* at 2.)

On August 13, 2019, after inviting and receiving further briefing (Docs. 161-63), the Court denied the Rule 56(d) motion. (Doc. 170.) In the Court's view, "nothing Wilhelm might say in his deposition would preclude summary judgment—EFG's failure to obtain an expert means its negligence claim is doomed." (*Id.* at 3.)

F. **Wilhelm's Motion For Sanctions**

Before the dust could settle, Wilhelm filed a motion for sanctions under Rule 11. (Doc. 171.) As discussed in more detail below, Wilhelm argues that EFG's "sole remaining claim does not have evidentiary support and is not warranted by existing law," so the continued pursuit of that claim is frivolous and warrants sanctions. (*Id.* at 1-2.) EFG opposes this request. (Doc. 176.)

Amid the hectic motion practice, EFG also responded to Wilhelm's motion for summary judgment. (Doc. 181.) The summary judgment motion (Doc. 157) and the motion for sanctions (Doc. 171) are now fully briefed and nobody has requested oral argument.

**ANALYSIS**

I. <u>Motion For Summary Judgment</u>

Wilhelm seeks summary judgment on EFG's sole remaining claim, the claim in Count Six for negligence. (Doc. 157.) His primary argument is that the claim fails as a matter of law because EFG cannot establish the standard of care—to do so would require an expert, and EFG does not have an expert. (*Id.* at 3-4.) Alternatively, Wilhelm argues the negligence claim fails because it is barred by the economic loss rule, EFG cannot establish causation, and EFG has sued the wrong party. (*Id.* at 4-6.) In its response, EFG argues that no expert is needed, the claim is not barred by the economic loss rule, a causal link exists between Wilhelm's actions and its alleged injuries, and it has sued the proper party. (Doc. 181.)

A. **Legal Standard**

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "If . . . [the] moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103.

"Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)). "A genuine dispute of material fact exists if 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *United States v. JP Morgan Chase Bank Account No. Ending 8215 in Name of Ladislao V. Samaniego, VL: $ 446,377.36*, 835 F.3d 1159, 1162 (9th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)). The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference in the nonmoving party's favor." *Rookaird*, 908 F.3d at 459. Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

B. **Applicable Law**

As previously noted, both parties have litigated the negligence claim under Texas law. (Doc. 170 at 5.) Wilhelm again utilizes Texas law in his motion for summary judgment. (Doc. 157.) Although EFG now raises the possibility that Arizona law may govern the negligence claim, it ultimately "believes Texas law applies." (Doc. 181 at 3-4.) Given that there is no serious dispute that Texas law governs the negligence claim, the

Court will continue to utilize Texas law.

C. **Merits**

Wilhelm's primary argument is that EFG was required to produce an expert who could opine on the applicable standard of care. (Doc. 157 at 3-4.) EFG has no such expert, so Wilhelm asserts its negligence claim must fail as a matter of law. (*Id.*)

Under Texas law, negligence has three elements: (1) a legal duty of care; (2) a breach of that duty; and (3) damages proximately caused by the breach. *Kroger Co. v. Elwood*, 197 S.W.3d 793, 794 (Tex. 2006). "If the conduct at issue involves the use of specialized techniques, then expert testimony is necessary to establish the standard of care and a violation of that standard." *VIA Metro. Transit v. Garcia*, 397 S.W.3d 702, 708 (Tex. Ct. App. 2012). Likewise, Texas courts generally require expert testimony when "the conduct at issue involves the use of specialized equipment . . . or knowledge of specialized industry practices and procedures." *Rodriguez v. CenterPoint Energy Houston Elec., LLC*, 2018 WL 5261246, *5 (Tex. Ct. App. 2018). *See also Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 583 (Tex. 2006) ("Expert testimony is required when an issue involves matters beyond jurors' common understanding."). Whether expert testimony is necessary is a question of law for the Court to decide. *FFE Transp. Servs., Inc. v. Fulgham*, 154 S.W.3d 84, 89-91 (Tex. 2004).

The Texas Supreme Court's decision in *Fulgham* provides a helpful illustration of these principles. There, a truck driver sustained injuries after a refrigerated trailer he was hauling, which he had leased from the defendant, broke loose, causing his truck to overturn. *Id.* at 86. In the ensuing lawsuit, the truck driver argued the accident had been caused by "loose and rusty bolts connecting parts of [the] trailer" and that defendant had acted negligently by "fail[ing] to timely and properly inspect and maintain the trailer" before leasing it to him. *Id.* at 87. The trial court granted a directed verdict in the defendant's favor because the truck driver failed to present expert testimony establishing the standard of care for his negligence claim. *Id.* The Texas Court of Appeals reversed, holding that expert testimony wasn't required because "the inspection and detection of loose and rusty

bolts connecting parts of a trailer is not a 'fact so peculiar to a specialized industry' and is within the experience of a layperson." *Id.* at 91 (citation omitted). However, the Texas Supreme Court reinstated the trial court's decision. *Id.* at 85. The court emphasized that "[t]he upper coupler assembly, kingpin, and base rail of a refrigerated trailer are specialized equipment, and the proper inspection and maintenance of those parts involve techniques unfamiliar to the ordinary person," so "[w]hile the ordinary person may be able to detect whether a visible bolt is loose or rusty, determining when that looseness or rust is sufficient to create a danger requires specialized knowledge." *Id.*

Similarly, in *Simmons v. Briggs Equip. Tr.*, 221 S.W.3d 109 (Tex. Ct. App. 2006), the plaintiff was using a rail-car moving device when a fire broke out in the engine compartment, causing the plaintiff to "launch" himself through a window to avoid the fire and sustain a back injury. *Id.* at 111. After an investigation by a fire inspector revealed that the fire had been caused by a "broken hydraulic hose," which caused hydraulic fluid to spew into the exhaust manifold and catch on fire, the plaintiff brought a negligence action against the company that was responsible for maintaining and repairing the device. *Id.* at 111-12. In support of this claim, the plaintiff presented evidence that the company had last inspected and repaired the device's hydraulic system in May 2002—about 15 months before the accident, which occurred in August 2003—and hadn't checked or repaired the hydraulic system during its last service attempt in June 2003. *Id.* at 113-14. However, the plaintiff did not present evidence from an expert that the company's conduct fell below the applicable standard of care. *Id.* at 114-15. The trial court concluded that expert testimony was required, and thus granted the defendant's motion for summary judgment, and the Texas Court of Appeals affirmed, holding that because "maintenance and service of a [rail-car mover] involves specialized equipment and techniques unfamiliar to a lay person"—"Few people not involved in the rail-car industry are familiar with rail-car movers, the functioning of their engines and other internal parts, or the frequency and type of inspection and maintenance they require"—the challenged conduct was not a "matter[] within a lay person's general knowledge." *Id.*

On the other end of the spectrum, the Texas Court of Appeals' recent decision in *AKIB Constr. Inc. v. Shipwash*, 582 S.W.3d 791 (Tex. Ct. App. 2019), exemplifies the type of situation in which expert testimony isn't required. In *Shipwash*, AKIB was required to "facilitate the purchase, dismantling, transportation, and reassembly of a steel building." *Id.* at 804. Shipwash was unhappy with the result and sued, arguing that the building had been dismantled in such a way that rendered it impossible to reconstruct. *Id.* AKIB argued that an expert was necessary to prove Shipwash's case but the Texas Court of Appeals disagreed. *Id.* Rather than present expert testimony, Shipwash had presented a series of before-and-after pictures of the building. *Id.* The "before pictures show a steel building with functional doors and sheet metal that appears intact." *Id.* The after pictures "show pieces of sheet metal lying crumpled and bent in piles around the jobsite," as well as "doors and retractable garage-type doors[] lying bent and broken on the ground." *Id.* The court concluded that, based on these pictures, a jury could determine that the building could not be reconstructed—no expert was needed. *Id.* at 804-805.

Turning to this case, EFG contends that Wilhelm negligently "took and failed to take certain actions related to his responsibility on behalf of EFG for acquiring ingredients and overseeing or mixing critical specialty chemical compounds." (Doc. 157-3 at 7.) Specifically, EFG contends:

> In May and June 2015, Defendant Wilhelm purchased quantities of various ingredients in amounts different than designated and in disproportion to the ratio indicated by the compound formulation EFG provided to him. He also failed to purchase six of the key ingredients, which made up approximately 34% of the chemical compound "modifier" needed for the company's product operation. One of these ingredients, called butyl stearate, was readily available. Instead, Defendant Wilhelm purchased an entirely different and completely unrelated chemical, zinc naphthenate. Most, if not all, of the other five key ingredients that Defendant Wilhelm failed to purchase for the manufacture of the modifier were readily available in the marketplace. He purchased a significant inventory of seven chemicals that were not listed in the required chemicals information and are not used by EFG at all. They were zinc naphthenate, steric acid, mercaptobenzimidazole, methyl-2 mercaptobenzimidazole, mercaptobenzimidazole zinc salt, N-isopropyl-N-phenyl-1-4-phenylenediamine, and dithiobisbenzanilide.

> Defendant Wilhelm also negligently purchased the same chemical, chlorinated paraffin, from two suppliers, unnecessarily paying one of the suppliers $300 more per unit. Additionally, the activator and modifier formula start-up requirements call for approximately 5,700 pounds of chlorinated paraffin and he purchased 26,500 pounds of it. The start-up requirements call for 569 pounds of triethylenetetramine and Defendant Wilhelm ordered 6,000 pounds of it. The start-up requirements call for 1,272 pounds of sulfur and Defendant Wilhelm ordered 8,400 pounds of it. The start-up requirements call for 1,706 pounds of 2-(4-morpholinydithio) benzothiazole and Defendant Wilhelm ordered 24,000 pounds of 4-(2-benzothiazolyldithio) morpholine as a substitute. The start-up requirements call for 2,843 pounds of alkylphenol disulfide (Vultac 2) and Defendant Wilhelm ordered 6,000 pounds of phenol, 4-(1,1-dimethylpropyl) as a substitute. The start-up requirements call for 6,737 pounds of coumarone rosin and Defendant Wilhelm ordered 31,400 pounds of it.

(*Id.*) In other words, EFG alleges that Wilhelm failed in his "responsibility for acquisition and preparation for certain critical specialty chemical compounds required in the creation of . . . EFG's products, including receiving information about the molecular structure and suppliers of each chemical." (Doc. 62 ¶ 48.)

Complex negligence claims like this one are exactly the types of claims for which Texas law requires an expert. Indeed, EFG's complaint and disclosures expressly acknowledge that the negligence claim implicates "specialty chemical compounds." Texas courts generally require expert testimony in this scenario. *Garcia*, 397 S.W.3d at 708 ("specialized techniques"); *Rodriguez,* 2018 WL 5261246 at *5 ("specialized equipment . . . or knowledge of specialized industry practices and procedures").

Even looking past such labels, there is little possibility that, without an expert, a jury would be able to tell something went wrong. *Cf. Simmons*, 221 S.W.3d at 115. A typical juror could probably tell that, for example, 26,500 pounds of chlorinated paraffin is much more than 5,700 pounds. (Doc. 157-3 at 7.) A typical juror may even notice, based on words alone, that "butyl stearate" looks much different from "zinc naphthenate." (*Id.*) A typical juror would not, however, likely understand that 2-(4-morpholinydithio) benzothiazole and 4-(2-benzothiazolyldithio) morpholine are different products—the

names alone require a basic understanding of organic chemistry to differentiate, let alone to glean the structural and chemical differences between the two. Even if a jury did detect a difference, it would not have the same visceral significance as pictures of obviously mangled steel. *Cf. Shipwash*, 582 S.W.3d at 804-05.

This dovetails with a more fundamental problem. Without an expert, the jury would be, at best, limited to seeing that what Wilhelm ordered was different from what EFG expected him to order. The significance of that error, if any, is beyond the average juror's understanding. EFG's own formulation of its claim alleges that Wilhelm ordered some of the products as "substitutes." (Doc. 157-3 at 7.) Discerning whether they were appropriate substitutes, or whether substitutions were allowable at all, would require specialized knowledge. *Cf. 3D/I+ Perspectiva v. Castner Palms, Ltd.*, 310 S.W.3d 27, 31 (Tex. Ct. App. 2010) (expert testimony was needed to establish a negligence claim against a construction management firm, even though the firm was accused of failing to "oversee[] the construction as set out in the approved contractors' design plans," because "whether a construction-management firm's supervisory duties included more than ensuring that the approved plans were built according to the requisite specifications called for in the plans requires specialized knowledge in the construction-management firm industry"). "Few people not involved in the" devulcanization industry could discern the ramifications of Wilhelm's alleged failures, *Fulgham*, 154 S.W.3d at 91, and the Court cannot bank on the jury pool containing the entire ASU chemistry department.

EFG's arguments to the contrary are unpersuasive. Its attempt to simplify what the jury would be asked to understand—that Wilhelm was supposed to order Chemical A, but instead ordered Chemical B—is far removed from the sort of obvious mistake that falls outside the expert requirement. *Compare AKIB*, 582 S.W.3d at 804 (holding that no jury was needed because pictures submitted into evidence made it clear that extensive damage had rendered building materials useless). More important, the jury would be left with no guide as to *why* ordering Chemical B rather than Chemical A was harmful. Without an expert, jurors would be left to ponder why one chemical couldn't replace another, or why

the excess ordering was so deleterious. Thus, EFG's argument that "a baking expert would not be needed if a person failed to obtain the ingredients on the recipe, bought others, and thereby baked the wrong cake" (Doc. 181 at 6) is unpersuasive—the average juror could grasp that substituting milk for flour in a cake recipe was a big mistake, but the same juror wouldn't have any basis for evaluating whether the decision to substitute "phenol, 4-(1,1-dimethylpropyl)" for "alkylphenol disulfide (Vultac 2)" was of a similar character.

The cases cited by EFG are distinguishable for similar reasons. For example, EFG cites *J.D. Abrams, Inc. v. McIver*, 966 S.W.2d 87 (Tex. Ct. App. 1998), for the proposition that when specialized techniques are unrelated to the injury at issue, no expert is required. (Doc. 181 at 7.) This is true but irrelevant here. In *McIver*, the court determined that the "specialized equipment or construction techniques" involved in road construction were unrelated to a driver being injured by a drunk driver. 966 S.W.2d at 90, 93. Thus, the case boiled down to a layperson's understanding of "[d]riving an automobile in areas of road construction and automobile accidents," which are "certainly not outside of the understanding of the average layman." *Id.* at 93. Here, in contrast, the specialized nature of EFG's business is directly at issue—Wilhelm stands accused of negligently failing to procure the correct chemicals at the very core of EFG's specialized devulcanization technology. It almost goes without saying that knowledge of organic chemistry is not as ubiquitous as knowledge of basic driving rules.

Similarly, *Missouri Pac. R. Co. v. Covarrubias*, 400 S.W.2d 599 (Tex. Ct. App. 1966), undercuts rather than supports EFG's argument. In that case, the court determined no expert was necessary because "[t]he law requires anyone handling explosives to use a high degree of care, and under the facts as developed in this case we feel that the jury was competent to determine whether or not appellant had used that high degree of care." *Id.* at 602. In other words, the standard of care was presumed—it did not need to be established. Here, there is no such presumption. The standard needs to be established, and establishment of that standard turns on questions of a specialized nature. Such a standard requires an expert to establish.

Finally, *Gomez de Hernandez v. New Tex. Auto Auction Servs., L.P.*, 193 S.W.3d 220 (Tex. Ct. App. 2006), also does not support EFG's position. There, the court concluded that "the applicable standard of care for a used car auctions house as it relates to the element of duty . . . is not so complex to require testimony from an expert to fully explain and develop it." *Id.* at 228. That was so because the court couldn't "conclude that participating in a used car auction is outside the common experience and understanding of the average layman." *Id.* EFG fails to explain how Wilhelm's duties in this case are akin to selling a used car. The average person will understand the car-selling process. The same can't be said of organic chemistry.[4]

EFG's authority, at bottom, merely demonstrates that Texas law does not require an expert in every negligence case. But EFG fails to demonstrate why an expert would be unnecessary here. It is not enough to point generically to other cases where an expert was not needed—*this case* needs to be of the type where an expert is not needed. Here, the details of "molecular structure" and the appropriateness of chemical substitutes are at issue. (Doc. 62 ¶ 48; Doc. 157-3 at 7.) These are technical questions not "within the experience of the layman." *Roark v. Allen*, 633 S.W.2d 804, 809 (Tex. 1982). An expert is needed to address the standard of care. EFG has no such expert. Accordingly, summary judgment is appropriate.

II.     Motion For Sanctions

Wilhelm also moves for sanctions pursuant to Rule 11. (Doc. 171.) He argues that "Plaintiffs" violated Rule 11 because they "insist[ed] on pursuing a factually and legally frivolous negligence claim." (*Id.* at 1.) EFG opposes the request, arguing its negligence claim had merit. (Doc. 176.)

"An attorney is subject to Rule 11 sanctions . . . when he presents to the court

---

[4] Moreover, *Gomez de Hernandez* was reversed. In *New Tex. Auto Auction Servs., L.P. v. Gomez de Hernandez*, 249 S.W.3d 400 (Tex. 2008), the Texas Supreme Court determined that the auction house owed no duty at all. *Id.* at 406-07. Although this outcome did not directly refute the Court of Appeals' holding on whether an expert was required, it does call it into doubt—discussion of the standard of care is moot if there is no duty in the first place.

'claims, defenses, and other legal contentions . . . [not] warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law[.]'" *Holgate v. Baldwin*, 425 F.3d 671, 675-76 (9th Cir. 2005) (citing Fed. R. Civ. Proc. 11(b)(2)) (alterations in original). Even if a claim is nonfrivolous when filed, a party has a continuing obligation to avoid later advocating a position that has become frivolous. *Buster v. Greisen*, 104 F.3d 1186, 1190 n.4 (9th Cir. 1997). A claim is frivolous if it "is legally or factually baseless from an objective perspective" and the attorney failed to conduct a reasonable and competent inquiry before pursuing it. *Holgate*, 425 F.3d at 676. "A legal argument violates Rule 11(b)(2) if it has 'no chance' of success under existing precedent." S. Gensler, 1 Federal Rules of Civil Procedure, Rules and Commentary, Rule 11, at 237 (2018).

In his motion for sanctions, Wilhelm reproduces the arguments presented in his summary judgment motion. In essence, his argument is that EFG's reading of the law is so erroneous that it is completely unjustified. (Doc. 171.) Although the Court previously expressed doubt that the negligence claim could survive summary judgment, the Court noted that "it's always possible that EFG will develop some additional lines of argument" that would get over the summary judgment hurdle. (Doc. 170 at 4 n.3.) And it was *possible*—in its summary judgment response, EFG attempted to further analogize its negligence claim to cases where no expert was needed to establish the standard of care. The fact that EFG and Wilhelm disagreed on the merits does not mean that EFG's arguments were completely meritless. Nor does "[t]he fact that the court ultimately rejects a legal argument" mean that the argument was frivolous. Gensler, Rule 11, at 237.[5]

---

[5] In his summary judgment motion, Wilhelm raised arguments beyond the requirement of a standard-of-care expert. (Doc. 157 at 4-6.) As discussed, the Court concludes that EFG's lack of an expert is fatal to its negligence claim, and as a result the Court does not reach the merits of Wilhelm's other arguments. Wilhelm raises these same additional arguments in his motion for sanctions, but it would be incongruous for the Court to avoid those issues on summary judgment only to address their frivolousness (and thus, indirectly, consider their merits) when reviewing Wilhelm's sanctions motion. *CQ Intern. Co. v. Rochem Intern., Inc., USA*, 659 F.3d 53, 61-62 (1st Cir. 2011) ("[N]or will we require district courts to spend valuable judicial resources in punctiliously analyzing the reasonableness of each and every legal and factual contention made by a party where, as here, such analysis is not necessary to resolve the merits of the central claim in dispute."). Besides, the Court has "wide discretion in determining whether Rule 11 sanctions are

Additionally, it is not clear what specific conduct Wilhelm seeks to sanction. His motion addresses the insistence of "Plaintiffs" on "pursuing a factually and legally frivolous negligence claim," but that claim was only asserted by one of the two Plaintiffs (Excel Fortress did not assert a negligence claim against Wilhelm) and, at the time the motion for sanctions was filed, EFG had yet to respond to the motion for summary judgment. (Doc. 171 at 1 [filed on August 14, 2019); Doc. 181 [EFG's response to summary judgment motion, filed on September 12, 2019].) Wilhelm's motion for summary judgment was, in fact, filed before Plaintiffs officially withdraw their other claims. (Doc. 157 [motion for summary judgment, filed on July 2, 2019]; Doc. 165 [motion to withdraw claims, filed on August 2, 2019].) The sanctions motion doesn't clarify what aspects of Plaintiffs' conduct are sanctionable. A generic invocation of Rule 11 falls short of the notice required by that Rule. Gensler, Rule 11, at 251. Conduct that is not specifically identified "cannot serve as the basis of sanctions imposed by the district court." *Storey v . Cello Holdings, L.L.C.*, 347 F.3d 370, 389 (2d Cir. 2003).

EFG's continued pursuit of the negligence claim was not frivolous, and, at any rate, Wilhelm has not identified the specific conduct he wants sanctioned. Thus, the Court declines to impose Rule 11 sanctions in this case.

Accordingly, **IT IS ORDERED** that:

(1) Wilhelm's motion for summary judgment (Doc. 157) is **granted**;

(2) Wilhelm's motion for sanctions (Doc. 171) is **denied**; and

(3) The Clerk of Court shall enter judgment accordingly and terminate this action.

Dated this 20th day of March, 2020.

Dominic W. Lanza
United States District Judge

---

appropriate" and is satisfied they are not warranted here. *Gotro v. R & B Realty Grp.*, 69 F.3d 1485, 1488 (9th Cir. 1995) (citation and internal quotation marks omitted).